IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **MCKENZIE LAW FIRM, P.A.,** and **OLIVER LAW OFFICES, INC.,** on behalf of themselves and all others similarly situated,<br><br>　　　　Plaintiffs,<br><br> v.<br><br>**RUBY RECEPTIONISTS, INC.,**<br><br>　　　　Defendant. | Case No. 3:18-cv-1921-SI<br><br>**OPINION AND ORDER** |

Keith S. Dubanevich and Cody Berne, STOLL STOLL BERNE LOKTING & SCHLACHTER PC, 209 SW Oak Street, Suite 500, Portland, OR 97204; Laurence D. King, Matthew B. George, and Mario M. Choi, KAPLAN FOX & KILSHEIMER LLP, 350 Sansome Street, Suite 400, San Francisco, CA 94104; Robert I Lax, Lax LLP, 380 Lexington Avenue, 31st Floor, New York, NY 10168; Jon M. Herskowitz, BARON & HERSKOWITZ, 9100 S. Dadeland Blvd, #1704, Miami FL; Gregory J. Brod, BROD LAW FIRM, PC, 96 Jessie Street, San Francisco, CA 94105. Of Attorneys for Plaintiffs.

Andrew R. Escobar and Austin Rainwater, DLA PIPER LLP, 701 Fifth Avenue, Suite 6900, Seattle, WA 98104. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

The named plaintiffs in this putative class action are McKenzie Law Firm, PA ("McKenzie") and Oliver Law Offices, Inc. ("Oliver") (collectively, "Plaintiffs"). McKenzie and Oliver are two relatively small law firms. The defendant is Ruby Receptionists, Inc. ("Ruby" or

"Defendant"). Ruby provides virtual receptionist services to small businesses, including law firms. McKenzie and Oliver are former clients of Ruby and assert claims of breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and money had and received. Pending before the Court is a discovery dispute between the parties concerning the application of the work-product doctrine.

In connection with both this lawsuit and a related state court action, counsel for Ruby sent emails and several drafts of a declaration to a former employee of Ruby after Ruby's counsel learned that the former employee had been speaking with an investigator working for Plaintiffs' counsel. As part of this email exchange, the former employee requested that Ruby's counsel make certain changes to the draft declaration. Ruby's counsel revised the draft declaration, the former employee signed the declaration, and Ruby's counsel filed the declaration in the related state court action. The former employee, without the need for a subpoena from Plaintiffs' counsel and without anyone telling Ruby's counsel, voluntarily sent to Plaintiffs' counsel copies of the emails exchanged with Ruby's counsel, including the drafts of the declaration. Ruby contends that these emails and the drafts of the declaration are protected under the work-product doctrine and may not be used by Plaintiffs in litigation with Ruby. Plaintiffs offer essentially two responses. First, Plaintiffs argue that the emails and declaration drafts are not work-product. Second, Plaintiffs contend that even if these documents are work product, Ruby waived the protections of the work-product doctrine by disclosing them to its former employee under circumstances in which there was a reasonable probability that the opposing party (Plaintiffs) would see these documents. As explained more fully below, the Court concludes that the documents are presumptively work product but that Ruby waived its right to preclude Plaintiffs' use of those documents in this lawsuit.

## STANDARDS

In federal court, the work-product doctrine is governed by federal law, even in diversity cases. *See Kandel v. Brother Int'l Corp.*, 683 F. Supp. 2d 1076, 1083 (C.D. Cal. 2010) (citing *Frontier Refining, Inc. v. Gorman-Rupp, Inc.*, 136 F.3d 695, 702 n.10 (10th Cir. 1998) ("Unlike the attorney-client privilege, the application of the work-product doctrine in diversity of citizenship cases is determined under federal law."). The work-product doctrine "is not a privilege but a qualified immunity protecting from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *Admiral Ins. Co. v. United States Dist. Court for the Dist. of Arizona*, 881 F.2d 1486, 1494 (9th Cir. 1989) (citing Fed. R. Civ. P. 26(b)(3)). Documents or the compilation of materials created by an attorney or agents of the attorney in preparation for litigation or trial may be covered by the work-product doctrine. *United States v. Richey*, 632 F.3d 559, 567 (9th Cir. 2011). To qualify for work-product protection, materials must: "(1) be prepared in anticipation of litigation or for trial and (2) be prepared by or for another party or by or for that other party's representative." *Id*. (quotation marks omitted). The primary purpose of the work-product doctrine is to "prevent exploitation of a party's efforts in preparing for litigation." *Admiral Ins. Co.*, 881 F.2d at 1494. Work-product protection, however, like the attorney-client privilege, is waivable. *Richey*, 632 F.3d at 567.

Further, the work-product doctrine affords special or heightened protection to materials that reveal an attorney's mental impressions or opinions. *Admiral Ins. Co.*, 881 F.2d at 1494; Fed. R. Civ. P. 26(b)(3)(B). Such materials are generally referred to as "opinion" or "core" work product and are distinguished from "fact" work product. Fact work-product may be ordered produced upon a showing of substantial need for the information and that the information cannot be otherwise obtained without undue hardship. *Admiral Ins. Co.*, 881 F.2d at 1494; Fed R. Civ. P. 26(b)(3)(A)(ii). Opinion or core work product, however, is discoverable only "when mental

impressions are at issue in a case and the need for the material is compelling." *Holmgren v. State Farm Mutual Ass'n. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992).

Finally, the party asserting protection under the work-product doctrine generally has the burden to show that the elements of the doctrine have been established. *United States v. City of Torrance*, 163 F.R.D. 590, 593 (C.D. Cal. 1995) ("The party claiming work product immunity has the burden of proving the applicability of the doctrine."); *Murphy v. Kmart Corp.*, 259 F.R.D. 421, 428 (D. S. Dakota 2009) ("The party asserting the work product privilege to resist disclosure bears the burden of providing a factual basis for asserting the privilege."); *see also United States v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009) (holding that the party asserting an attorney-client privilege has the burden of proving "each essential element" of that privilege).

When a party opposing the assertion of the work-product doctrine, however, contends that the opposing side has waived the benefits of that doctrine, the question of which side bears the burden of proving waiver or non-waiver arises. The Court has not located any decision from the Ninth Circuit addressing this question or even any decision from a district court within the Ninth Circuit.[1] The Fifth Circuit, however, has addressed this issue and held that the party asserting waiver "bears the burden of demonstrating that a waiver of work product protection occurred." *Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 379 (5th Cir. 2010). As the Fifth Circuit explained:

> Chevron argues that the plaintiffs, as the party claiming work product protection, bear the burden of demonstrating non-waiver. It cites to *United States v. MIT*, a decision of the First Circuit that adopts this view. 129 F.3d 681, 686 (1st Cir. 1997). However, to support this proposition, the First Circuit only cites authority concerning the attorney-client privilege. *Id.* (citing *United States v.*

---

[1] Although the Ninth Circuit discussed generally the issue of waiver of work-product protection in *Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010), the Ninth Circuit in that case did not expressly announce which side had the burden of proving waiver.

> *Wilson*, 798 F.2d 509, 512–13 (1st Cir. 1986)). The work product
> doctrine differs from the attorney-client privilege in that non-
> waiver need not be proven to invoke work product immunity.
> *Johnson* [*v. Gmeinder*], 191 F.R.D. [638,] 643 [(D.Kan. 2000)].

*Id*. at 379 n.10. Similarly, other out-of-circuit district courts have placed the burden on the party asserting waiver of work-product protection. *See, e.g.*, *Pipeline Productions, Inc. v. The Madison Companies, LLC*, 2019 WL 3973955, *4 (D. Kan. Aug. 22, 2019) ("Once the party objecting to discovery establishes that the materials are protected work product, the burden shifts to the party asserting waiver to establish that a waiver has occurred."); *Towne Place Condo. Ass'n v. Philadelphia Indem. Ins. Co*., 284 F. Supp. 3d 889, 899 (N.D. Ill. 2018) ("Where work product is claimed, the party asserting waiver has the burden to show that a waiver occurred."); *United States Sec. & Exch. Comm'n v. Herrera*, 324 F.R.D. 258, 262 (S.D. Fla. 2017) (stating that after the party asserting work-product protection meets its initial burden, "the burden shifts to the party asserting waiver"); *Mir v. L-3 Commc'ns Integrated Sys., L.P.*, 315 F.R.D. 460, 467 (N.D. Tex. 2016) ("Unlike the attorney-client privilege, the burden of proving waiver of work product immunity falls on the party asserting waiver."). Accordingly, this Court holds that the party asserting waiver of work-product protection bears the burden of demonstrating that a waiver of that protection has occurred.

## BACKGROUND

### A. Overview of Federal and State Lawsuits

Ruby Receptionists is a business based in Portland, Oregon that provides receptionist services to small businesses throughout North America. The putative class in this federal action consists of all of Ruby's clients in the United States for telephone call answering and messaging services. Many of Ruby's clients are small law firms and solo practitioners. Ruby's clients enter into written contracts with Ruby to purchase receptionist services. Ruby bills its clients based on

the quantity of "receptionist minutes" used or contracted for per month. Plaintiffs' claims in this case stem from two of Ruby's billing practices. First, Plaintiffs allege that Ruby failed to disclose to its clients Ruby's practice of "rounding up" to the nearest 30-second increment when calculating a "receptionist minute." Second, Plaintiffs allege that Ruby failed to disclose to its clients that Ruby includes in its charges the time that callers have been placed "on hold" or "parked" by Ruby's receptionists.

Ruby's clients enter into written contracts with Ruby for a set number of "receptionist minutes" per month for a fixed monthly fee. There also is an agreed-upon fee "per receptionist minute" for any additional minutes used beyond the set monthly number. Plaintiff Oliver contracted with Ruby from October 2012 through May 2013. Oliver agreed to purchase 100 receptionist minutes per month for $229 and further agreed to pay $2.29 for each additional receptionist minute used after 100 minutes per month. Plaintiff McKenzie contracted with Ruby from April 2016 through November 2018. McKenzie agreed to purchase 200 receptionist minutes per month for $413.08 and further agreed to pay $2.07 for each additional receptionist minute used after 200 minutes per month.

As alleged by Plaintiffs, when calculating billing Ruby rounds up telephone calls to the next 30-second increment. Thus, a telephone call that lasts ten seconds, for example, would be billed for thirty seconds (or one-half of a receptionist minute). A telephone call that lasts one minute and thirty-one seconds would be billed for two minutes, as would a telephone call that lasts one minute and fifty-nine seconds. The time billed also includes any "hold" or "parked" time incurred after a Ruby receptionist first answers the call until the call is transferred. Ruby charges for the entire duration of the telephone call, including "hold" or "parked" time, from the moment the call is first answered until: (a) the call is connected to the client; (b) the call is

transferred to voicemail; (c) the receptionist finishes taking a message or answering a question and the call terminates or disconnects; or (d) the call otherwise terminates or disconnects.

Ruby's written contracts do not define the term "receptionist minute" or otherwise explain how Ruby calculates time for billing purposes. Ruby has a document entitled "Terms and Conditions," which includes an integration clause. That clause states: "These Terms and Conditions and the Ruby Receptionist Service Agreement set forth the entire Agreement between the parties. This Agreement shall be binding upon all successors and assigns of the parties hereto." The Terms and Conditions and the separate document titled "Service Agreement," thus, together comprise the written contract between Ruby and its client. The contract has a 30-day term and automatically renews unless one party gives written notice 30 days in advance. Ruby's clients can access and view their billing records and call history on Ruby's website and app.

In late 2017, the same attorneys who represent McKenzie and Oliver in this federal putative class action filed a putative class action against Ruby in Oregon state court on behalf of a different named plaintiff. That action is currently titled *Maiden Insurance LLC v. Ruby Receptionists, Inc.*, Multnomah County Circuit Court, Case No. 17CV48545 ("*Maiden*"). In *Maiden*, the plaintiffs allege facts and claims against Ruby that are very similar to the facts and claims presented in this federal lawsuit.

**B. Pending Discovery Dispute**

For several months between late 2014 and early 2015, Mr. Justin Enger worked for Ruby as a sales associate. ECF 96-9, ¶ 2. As previously noted, the *Maiden* lawsuit was filed in state court in 2017. In late 2018, an investigator working for Plaintiffs' counsel spoke with Mr. Enger. ECF 96, ¶ 3. Plaintiffs commenced this federal action in November 2018.

On July 3, 2019, Plaintiffs' counsel filed in *Maiden* Plaintiff's Second Motion to Compel. ECF 96-1. In that motion, Plaintiffs' counsel asked the state court to order Ruby to search the

electronic files of certain current and former Ruby employees, including Mr. Enger. Also in that motion, Plaintiffs' counsel stated:

> Justin Enger, former Sales Associate: Enger told an investigator that his former supervisor, Ashley Fisher-Nelson, instructed him "not to advertise" the round-up charges to clients. Enger also thought that Ruby did not charge customers when a receptionist was not involved in the call, which he referred to as "parking." This contradicts Ruby's practice of charging for the time a caller is on hold. Enger is believed to have knowledge of management directions to omit to disclose Ruby's rounding practices.

ECF 96-1 at 14.

On July 25, 2019, Ruby's counsel told Plaintiffs' counsel that Ruby intended to take the deposition of Mr. Enger. The next day, July 26, 2019, the state court judge held a hearing in *Maiden*. During that hearing, Plaintiffs' counsel explained what he had learned from Mr. Enger. ECF 96-2 at 5. Ruby's counsel then responded, as follows:

> Turning to a couple of the other issues. They raise Mr. Enger. We'll address Mr. Enger in our opposition. He's an employee who was fired by Ruby for lying repeatedly. It's no wonder that he has an axe to grind. He – our view is that he's lying about that statement that he put in the motion to compel.
>
> We noticed up his deposition or we intend to notice up his deposition in the federal action. So when they're raising his documents here, there is a pending federal case and we've noticed up or we intend to subpoena him in the federal action as a former employee and that will be happening shortly.

*Id*. at 12. On August 5, 2019, Ruby filed in *Maiden* its written response to Plaintiff's Second Motion to Compel. In that document, Ruby again stated that it had fired Mr. Enger for "repeatedly lying." ECF 96-3 at 2 and 6-7. The next day, August 6, Ruby served on Plaintiffs' counsel Ruby's notice of deposition of Mr. Enger. ECF 96-4.

On August 9, 2019, Ruby's counsel spoke with Mr. Enger by telephone. Later that day, Ruby's counsel sent an email to Mr. Enger and enclosed a draft declaration. ECF 96-5. In that email, Ruby's counsel said to Mr. Enger:

> It was a pleasure speaking with you this afternoon. To follow up on our call, I've prepared the attached declaration in which I attempted to capture what you conveyed to me during our discussion. If this looks accurate to you, can you please scan/email a signed version to me and then mail me the original at my Seattle address below? Of course, if you believe something in the declaration is inaccurate, please let me know.
>
> Assuming the signed declaration aligns substantively with what we discussed by phone, I don't see a need to bother you with a deposition and will cancel the subpoena we served earlier this week.
>
> If you have any questions or want to discuss anything further, please let me know. Otherwise, have a nice evening.

*Id*. at 1; *see also id.* at 4 (draft declaration).

Three days later, August 12, 2019, Mr. Enger responded by email to Ruby's counsel. Mr. Enger stated: "There are some portions that I definitely [do] not feel too comfortable with. Please see below the parts that need correction in red below[.]" ECF 96-6 at 4. Mr. Enger included certain modifications that he wanted made to his draft declaration. *Id*. Ruby's counsel promptly responded that day, stating, among other things:

> I definitely don't want you signing anything that you're uncomfortable with or that you believe to be inaccurate from your perspective. My goal in preparing the draft was to capture what I understood from our conversation this past Friday. With that in mind, are you available for a quick call this afternoon/early evening to discuss your highlighted language to make sure I understand it?
>
> In particular, a directive by Ms. Fisher-Nelson to specifically "not advertise" to prospective customers that Ruby billed in 30-second rounded-up increments contradicts what other sales individuals, including Ms. Fisher-Nelson, have indicated. I'd like to understand whether what you reference below is a specific/explicit direction to

> this effect or is instead your take-away based on more general
> sales-oriented advice and practices. In short, I want to make sure
> we're not talking past each other on this issue --- your recollection
> is what it is, and I don't want to misconstrue it.

ECF 96-6 at 3. Mr. Enger promptly responded to Ruby's counsel and provided clarifying statements. *Id*. at 2-3. Ruby's counsel replied and agreed to revise the declaration "based on the feedback in your emails below and circulate it to you for your review." *Id*. at 2. Later that evening, Ruby's counsel sent Mr. Enger a revised draft declaration. *Id*. at 1; *see also id.* at 9 (revised draft declaration). Mr. Enger signed the revised declaration on August 12, 2019. ECF 96-9 at 2 (signed declaration). Also, on August 12th, *Plaintiffs' counsel* served on Ruby's counsel a notice of deposition of Mr. Enger in the *Maiden* case. ECF 96-12.

The next day, August 13, 2019, Ruby's counsel filed Mr. Enger's signed declaration in *Maiden*, in further support of Ruby's response to Plaintiff's Second Motion to Compel. ECF 96-9. Later that day, Mr. Enger forwarded to *Plaintiffs' counsel* the emails and declaration draft that Mr. Enger had just exchanged with Ruby's counsel. ECF 96-5; ECF 96-6. Apparently, neither Mr. Enger nor Plaintiffs' counsel told Ruby's counsel that Plaintiffs' counsel now had these emails and declaration drafts. On August 16, 2019, Ruby withdrew its notice of deposition and cancelled the deposition of Mr. Enger. ECF 96-11. The deposition of Mr. Enger, however, remained scheduled, based on the notice sent by Plaintiffs' counsel on August 12th.

On November 15, 2019, Plaintiffs' counsel took the deposition of Mr. Enger, noticed in both the *Maiden* lawsuit and in this federal action. *See* ECF 96-7 (deposition transcript). The deposition began at 9:00 a.m. Within about 30 minutes, the parties called the undersigned judge for assistance in resolving a discovery dispute. Ruby's counsel explained that Plaintiffs' counsel was attempting to introduce as deposition exhibits the emails exchanged between Mr. Enger and Ruby's counsel, including the declaration drafts. Ruby's counsel asserted that these documents

were protected against discovery and use under the work-product doctrine. Plaintiffs' counsel responded that Mr. Enger, who is not a party in either lawsuit, voluntarily provided Plaintiffs' counsel with the emails exchanged between Mr. Enger and Ruby's counsel. Plaintiffs' counsel stated:

> We're not asking for things out of [Ruby's counsel's] file, but even if they were at some point work product, it was certainly waived by A, providing them to Mr. Enger who is a nonparty and non [*sic*] represented, and by Mr. Enger then providing them to my law firm.

ECF 96-7 at 38-39.

Because the parties were in the midst of Mr. Enger's deposition, Mr. Enger was not a party in either lawsuit, and Plaintiffs' counsel had already seen the emails and declaration drafts, the Court ruled that Plaintiffs' counsel could complete the deposition of Mr. Enger, including questioning him about the emails and drafts. The Court added, however, that all questioning about the emails and drafts must be placed under seal for the time being. *Id*. at 40-42. The Court would then receive briefing from the parties and decide whether the work-product doctrine applied and, if so, whether it had been waived when Ruby's counsel sent the emails and drafts to Mr. Enger. *Id.*

## DISCUSSION

The United States Supreme Court established the work-product doctrine in *Hickman v. Taylor*, 329 U.S. 495 (1947). In that decision, the Supreme Court stated:

> Here is simply an attempt, without purported necessity or justification, to secure written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties. As such, it falls outside the arena of discovery and contravenes the public policy underlying the orderly prosecution and defense of legal claims. Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney.

*Hickman*, 329 U.S. at 510. The work-product doctrine continued to develop as a matter of federal common law for 23 years. That changed in 1970 with the amendment to Rule 26 of the Federal Rules of Civil Procedure. As the 1970 Advisory Committee on Civil Rules explained:

> In deciding the *Hickman* case, the Supreme Court appears to have expressed a preference in 1947 for an approach to the problem of trial preparation materials by judicial decision rather than by rule. Sufficient experience has accumulated, however, with lower court applications of the *Hickman* decision to warrant a reappraisal.

Fed. R. Civ. P. 26(b)(3) advisory committee's notes to 1970 amendment. The current version of the work-product doctrine provides:

> (3) *Trial Preparation: Materials.*
>
> (A) *Documents and Tangible Things.* Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:
>
>     (i) they are otherwise discoverable under Rule 26(b)(1); and
>
>     (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.
>
> (B) *Protection Against Disclosure.* If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.
>
> (C) *Previous Statement.* Any party or other person may, on request and without the required showing, obtain the person's own previous statement about the action or its subject matter. . . .

Fed. R. Civ. P. 26(b)(3).

The emails exchanged between Ruby's counsel and Mr. Enger, including the attached draft declarations, are documents and tangible things. They also were prepared in connection

with and for an existing lawsuit (indeed, two lawsuits). Further, the emails from Ruby's counsel and the declaration drafts were prepared by the attorney for the benefit of a party (Ruby) other than the party that now seeks to use these documents (Plaintiffs). Thus, these documents presumptively fall within the category of work product.[2]

Notwithstanding this conclusion, "[t]he privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived." *United States v. Nobles*, 422 U.S. 225, 239 (1975); *Richey*, 632 F.3d at 567 ("The work-product doctrine's protections are waivable."). The relevant inquiry now is to determine the circumstances under which a waiver can occur and whether such circumstances exist in this case.

The standards governing the waiver of work-product protection are narrower, or more restrictive, than the standards used for finding waiver of the attorney-client privilege. As explained by U.S. District Judge William Alsup,

> The attorney-client privilege has its basis in the confidential nature of the communication and the reason for the privilege ordinarily ceases to exist if confidentiality is destroyed by voluntary disclosure to a third person. On the other hand, the purpose of work-product immunity is not to protect the evidence from disclosure to the outside world, but rather to protect it only from the knowledge of opposing counsel and client, thereby preventing its use against the lawyer gathering the materials. 8 FED. PRAC. & PROC. CIV. 2024 (3d ed.). Thus, disclosure of a document to a third person does not waive work-product immunity, *unless it has substantially increased the opportunity for the adverse party to obtain the information.*

---

[2] It is less clear whether the emails that Mr. Enger sent to Ruby's counsel also are work product, based on Mr. Enger's substantive responses to comments from Ruby's counsel. Those comments appear to reveal some of what Ruby's counsel was saying to Mr. Enger. Under the rule, however, Mr. Enger is entitled to obtain from Ruby's counsel a copy of Mr. Enger's own previous statements without having to make any showing. *See* Fed. R. Civ. P. 26(b)(3)(C). In light of the Court's conclusion regarding waiver, the Court need not resolve this specific question. In addition, Ruby does not contend that the documents at issue are opinion or core work product, and they do not appear to be so.

> If a document otherwise protected by work-product immunity is disclosed to others with an actual intention, or reasonable probability, that an opposing party may see the document, the party who made the disclosure cannot subsequently claim work-product immunity. *In re Imperial Corp. of Am.*, 167 F.R.D. 447, 456 (S.D. Cal. 1995) *aff'd*, 92 F.3d 1503 (9th Cir. 1996). A voluntary waiver, however, only occurs when "a party discloses [protected] information to a third party who is not bound [to maintain its confidence], or otherwise shows disregard for the [protection] by making the information public." *Bittaker v. Woodford*, 331 F.3d 715, 719, 720 n.4–6 (9th Cir. 2003). Waiver of work-product immunity does not, however, destroy work-product immunity for other documents of the same character. *In re EchoStar Commc'ns Corp.*, 448 F.3d 1294, 1302 (Fed. Cir. 2006).

*Skynet Elect. Co., Ltd. v. Flextronics Int'l., Ltd.*, 2013 WL 6623874, at *3 (N.D. Cal. Dec. 16, 2013) (emphasis added).[3] Other district courts in the Ninth Circuit have followed and clarified this approach.

In *Shenwick v. Twitter, Inc.*, U.S. Magistrate Judge Sallie Kim stated:

> Voluntary disclosure to a third party can waive the protection of the attorney work product doctrine, but disclosure of attorney work product to a third party does not waive protection "'*unless it has substantially increased the opportunity for the adverse party to obtain the information.*'" *Anderson v. Seaworld Parks and Ent., Inc.*, Case No. 15-cv-02172-JSW (JCS), 2019 WL 131841 at *4 (N.D. Cal. Jan. 8, 2019) (citing *Skynet Elec. Co., Ltd. v. Flextronics Int'l, Ltd.*, No. C 12-06317-WHA, 2013 WL 6623874, at *3 (N.C. Cal. Dec. 16, 2013)). The reason for this rule is that the "purpose of the attorney work product doctrine is to shield litigation strategy from disclosure to a litigation adversary." *Id*. Courts have applied a "common interest doctrine" to claims that attorney work product disclosed to third parties remains shielded from discovery. *See, e.g., Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 580 (N.D. Cal. 2007). Thus, for example, the Court in

---

[3] In *Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003) (en banc), the Ninth Circuit observed: "An express waiver [of the attorney-client privilege] occurs when a party discloses privileged information to a third party who is not bound by the privilege, or otherwise shows disregard for the privilege by making the information public." *Id*. at 719. The Ninth Circuit added: "Although our decision is couched in terms of the attorney-client privilege, it applies equally to the work product privilege, a complementary rule that protects many of the same interests." *Id*. at 722 n.6.

> *Anderson* addressed the application of the attorney work product doctrine in the context of a company's communications with its public relations agency, retained to help formulate the company's response to litigation, and found that there was no waiver of work product. 2019 WL 131841, at *4. But a party can waive the protection of the attorney work product doctrine via questions and conversation with a third party who has no "common interest" with the party seeking protection. *See, e.g., SEC v. Gupta*, 281 F.R.D. 169 (S.D.N.Y. 2012) (holding that government could not assert work product doctrine over communications with third party because third party and government did not have any "common interest" in the proceedings).

2019 WL 3815719, at *3 (N.D. Cal. Apr. 19, 2019) (emphasis added).

Similarly, in *Sugar Hill Music v. CBS Interactive Inc.*, U.S. Magistrate Judge Jacqueline Chooljian, noted:

> The attorney-client privilege and the protection for work product may be waived by disclosure or by other conduct. . . . For example, voluntarily sharing privileged information with third parties will generally destroy the attorney-client privilege unless the third party is acting as an agent of the attorney or client. Although the Court has located no Ninth Circuit authority addressing such issue as to the work product doctrine, most circuits which have addressed the issue have held that the voluntary disclosure of work product to a third party does not waive the work product protection *unless such disclosure enables an adversary to gain access to the information*.

2014 WL 12586744, at *8 (C.D. Cal. Sept. 5, 2014) (emphasis added) (footnotes and citations omitted); *see also Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 378 (5th Cir. 2010) (noting that work-product protection is not automatically waived by disclosure of protected material to third parties but is waived if disclosure has substantially increased opportunities for potential adversaries to obtain the information).

Applying these principles to the pending dispute and recognizing that Plaintiffs bear the burden of proving waiver, the Court begins by noting that Ruby did not obtain or even request from its former employee Mr. Enger any assurance, commitment, or agreement to maintain the confidentiality of the communications exchanged, *i.e.*, the emails between Ruby's counsel and

Mr. Enger or the draft declarations. Further, there is no common interest that is apparent between Ruby and Mr. Enger, who was fired by Ruby, Ruby does not contend otherwise. In addition, just days before Ruby's counsel began his email correspondence with Mr. Enger, Ruby's counsel told the state judge in a court hearing in *Maiden* and in a filed document served on Plaintiffs' counsel in that case that Mr. Enger had been "fired by Ruby for lying repeatedly" and had "an axe to grind" with Ruby. Ruby must have anticipated that its counsel's aspersions about Mr. Enger would be passed along to Mr. Enger by Plaintiffs' counsel, which would likely not engender a spirit within Mr. Enger of wanting to help Ruby keep confidential any future communications between Mr. Enger and Ruby's counsel.

Finally and most importantly, at that same court hearing in *Maiden*, which occurred several days before the email correspondence between Ruby's counsel and Mr. Enger even began, Plaintiffs' counsel disclosed to Ruby's counsel (and to the state court judge) that Plaintiffs, through their investigator, were already in contact with Mr. Enger and had received from Mr. Enger information that they considered to be helpful to Plaintiffs' counsel in the lawsuits against Ruby. Thus, the email communications exchanged between Ruby's counsel and Mr. Enger shortly after Ruby's counsel disparaged Mr. Enger and shortly after Ruby's counsel learned that Mr. Enger had been communicating with Plaintiffs' investigator were made under circumstances that substantially increased the opportunity for the adverse party (Plaintiffs) to obtain these emails from Mr. Enger. The totality of these facts are sufficient to satisfy Plaintiffs' burden of showing that Ruby has waived its work-product protections for the materials at issue.

## CONCLUSION

Any work-product protections that might have applied to the emails and draft declarations exchanged between Mr. Enger and Ruby's counsel that are the subject of the dispute pending before the Court have been waived by Ruby. The Court's previous order directing that

these documents and Mr. Enger's related deposition testimony be maintained under seal is rescinded.

**IT IS SO ORDERED**.

DATED this 16th day of December, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge
