**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **McKENZIE LAW FIRM, P.A.**, and **OLIVER LAW OFFICES, INC.**, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>**RUBY RECEPTIONISTS, INC.**,<br><br>        Defendant. | Case No. 3:18-cv-1921-SI<br><br>**OPINION AND ORDER** |

Keith S. Dubanevich, Cody O. Berne and Megan K. Houlihan, STOLL BERNE PC, 209 SW Oak Street, Suite 500, Portland, OR 97204; Laurence D. King, Matthew B. George, and Mario M. Choi, KAPLAN FOX & KILSHEIMER LLP, 350 Sansome Street, Suite 400, San Francisco, CA 94104; Robert I. Lax, LAX LLP, 380 Lexington Avenue, 31st Floor, New York, NY 10168; Jon M. Herskowitz, BARON & HERKSOWITZ, 9100 S. Dadeland Blvd, # 1704, Miami FL; Gregory J. Brod, BROD LAW FIRM PC, 96 Jessie Street, San Francisco, CA 94105. Of Attorneys for Plaintiffs.

Misha A.D. Isaak, Renee E. Rothauge, Julia E. Markley, Philip R. Higdon, Patrick L. Rieder, Edward Choi, and Gregory J. Mina, PERKINS COIE LLP, 1120 NW Couch Street, Tenth Floor, Portland, OR 97209; Andrew R. Escobar and Austin Rainwater, DLA PIPER LLP, 701 Fifth Avenue, Suite 6900, Seattle, WA 98104. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiffs and class representatives McKenzie Law Firm, P.A. and Oliver Law Offices,

Inc. are former clients of Defendant Ruby Receptionists, Inc. ("Ruby"), a business that provides

virtual receptionist services. In this class action, Plaintiffs allege breach of contract, breach of the

duty of good faith and fair dealing, money had and received, and unjust enrichment, all based on

Ruby's allegedly misleading practices relating to the billing of what Ruby calls a "receptionist

minute." Under Rule 23(b)(3) of the Federal Rules of Civil Procedure, the Court certified a class

consisting of:

> All persons or entities in the United States who obtained
> receptionist services from Defendant Ruby Receptionists between
> November 2, 2012 and May 31, 2018, pursuant to its form Service
> Agreements.

Order Certifying Class (ECF 128); *McKenzie Law Firm PA. v. Ruby Receptionist, Inc.*, 2020

WL 1970812, at *11 (D. Or. April 24, 2020). In that Order, the Court also summarized the facts

of this case. *Id*. at *2-4. The parties have waived their right to a jury, and the Court has scheduled

a 13-day bench trial to begin on January 11, 2021.

Now before the Court are the following seven motions:

1. Defendant's First Motion for Summary Judgment (Contract Interpretation) (ECF 163);

2. Defendant's Second Motion for Summary Judgment (Affirmative Defenses and Damages) (ECF 164);

3. Defendant's Motion to Decertify the Class (ECF 165);

4. Defendant's Third Motion for Summary Judgment (Terms and Conditions) and Second Motion to Decertify the Class (ECF 199);

5. Plaintiffs' Motion for Partial Summary Judgment (Breach of Contract) (ECF 198);

6. Plaintiffs' Motion to Exclude Defendant's Expert Lori Bocklund (ECF 203); and

7. Plaintiffs' Objections to and Motion to Exclude Certain Evidence from the Declaration and Supplemental Declaration of Diana Stepleton (ECF 208).

In these motions, Plaintiffs and Defendant argue, among other things, that they are each entitled to summary judgment on Plaintiffs' claim of breach of contract. Ruby argues that it should receive summary judgment on this claim because extrinsic evidence of the parties' intent shows that a critical mass of class members understood at the time of contracting that Ruby measured a "receptionist minute" by always rounding up to the next 30-second increment. According to Ruby, this understanding by a critical mass resolves any ambiguity in the term "receptionist minute." Taking the opposite position, Plaintiffs argue that they should receive summary judgment on their breach of contract claim because the Court should resolve any ambiguity in the meaning of "receptionist minute" by construing that term against the contract's drafter, Ruby.

Ruby also argues that the extrinsic evidence showing that many class members shared Ruby's understanding of the term "receptionist minute" destroys the commonality and predominance of questions of law or fact necessary to sustain a class action. Ruby adds that affirmative defenses like account stated, waiver, and modification, as well as changes Ruby made to its Terms and Conditions in 2018 and 2019 entitle Ruby to partial summary judgment against some class members and on some periods and measures of damage. Ruby also contends that these affirmative defenses warrant decertification of the class. Finally, Ruby added a mandatory arbitration clause to its Terms and Conditions in September 2019 and now asks the Court to enforce that clause against applicable class members.

Finally, Plaintiffs ask the Court to exclude the expert report of Lori Bocklund as well as summary evidence and portions of a declaration from Ruby's Vice President for Legal Affairs Diana Stepleton. Plaintiffs argue that Bocklund's testimony—on which Ruby's rebuttal expert on damages relies—is not proper opinion testimony. Instead, Plaintiffs assert, Bocklund's

statements concern only evidentiary facts and Bocklund lacks personal knowledge of those facts.

Plaintiffs also contend that the Court should exclude Stepleton's summary evidence and portions

of her declaration because Ruby has not complied with the requirements of Rule 1006 of the

Federal Rules of Evidence, which governs the admissibility of summary evidence.

## STANDARDS

### A.    Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must view

the evidence in the light most favorable to the non-movant and draw all reasonable inferences in

the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th

Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling

on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of

the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus.

Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

When parties cross-move for summary judgment, a court "evaluate[s] each motion

separately, giving the non-moving party in each instance the benefit of all reasonable

inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006)

(quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605

F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately

under [the] same standard."). In evaluating these motions, a court "must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The non-moving party then bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

**B.      Contract Interpretation under Oregon Law**

Under Oregon law, the primary objective for any court interpreting a contract is to give effect to the parties' agreed-upon intentions. *See, e.g.*, *Connall v. Felton*, 225 Or. App. 266, 272 (2009). Oregon courts have established a three-step process for interpreting contracts. *See Yogman v. Parrott*, 325 Or. 358, 361 (1997); *Ross Dress For Less, Inc. v. Makarios-Oregon, LLC*, 210 F. Supp. 3d 1259, 1263 (D. Or. 2016). First, a court must determine whether the relevant contract provision is ambiguous. *See Apeldyn Corp. v. Eidos, LLC*, 943 F. Supp. 2d 1145, 1149 (D. Or. 2013) (citing *McKay's Mkt. of Coos Bay, Inc. v. Pickett*, 212 Or. App. 7, 12 (2007)).

After finding that a contractual provision is ambiguous, a court proceeds to the second step in the *Yogman* analysis. At the second step, the trier of fact must look beyond the four corners of the agreement to determine the parties' mutual intention, if a mutual and common intention in fact existed. *Id.* "At the second step, the trier of fact examines extrinsic evidence of the contracting parties' intent and construes the disputed contractual provision consistent with that intent, if such a resolution can be determined." *Id.* Oregon follows the objective theory of

contracts, and thus relevant evidence at step two may include manifestations of intent, including any expressions of any common understanding communicated by the parties. *Id.* Without direct evidence of the parties' intent, a court also may look to the parties' course of dealing or their performance during the term of the contract as relevant circumstantial, or inferential, evidence of their common understanding, if any, of the ambiguous provision. *See Apeldyn*, 943 F. Supp. 2d at 1149; *Yogman*, 325 Or. at 363-64.

Without either direct or circumstantial evidence to aid the trier of fact in determining the parties' intent, or if the contract remains ambiguous even after considering that evidence, the third step is to apply any relevant maxims of construction. *Id.* at 364. When a contractual provision is ambiguous, determining its meaning at steps two and three of the *Yogman* analysis is generally a question of fact not appropriate for resolution at summary judgment. *Dial Temp. Help Serv., Inc. v. DLJ Int'l Seeds, Inc.*, 255 Or. App. 609, 611 (2013) (noting the general rule that the meaning of a contract may be disposed of through summary judgment only if the contract is unambiguous); *PGF Care Ctr., Inc. v. Wolfe*, 208 Or. App. 145, 151 (2006) ("Disputes over the meaning of a contract provision may not be disposed of by summary judgment if the provision is ambiguous."). Oregon courts have emphasized that it is not the ambiguity of a contract per se that makes summary judgment inappropriate, but that the ambiguity represents a dispute over a genuine issue of material fact. *Dial*, 255 Or. App. at 611.

## DISCUSSION

### A. Contract Interpretation Applied

Ruby and Plaintiffs each argue that they are entitled to summary judgment on Plaintiffs' breach of contract claim. Plaintiffs previously moved for partial summary judgment, arguing that the term "receptionist minute" unambiguously required Ruby to bill customers only for the actual time that a Ruby receptionist was on the telephone with a customer of a class member.

The Court denied Plaintiffs' motion after concluding that that term "receptionist minute" was ambiguous, and for the reasons previously explained the Court continues to find that the term "receptionist minute" is ambiguous. *See* Order and Opinion Denying Plaintiffs' Motion for Partial Summary Judgment (ECF 59); *McKenzie Law Firm PA. v. Ruby Receptionist, Inc.*, 2019 WL 3412903, at *4-6 (D. Or. July 29, 2019).[1]

Plaintiffs now argue that they are entitled to summary judgment for two alternative reasons. First, Plaintiffs argue that, because Ruby's contract is a contract of adhesion, the Court should forgo the *Yogman* analysis and instead strictly construe the contract's terms against the drafter, Ruby. This maxim of contract interpretation is known as "*contra proferentum.*" Second, Plaintiffs alternatively argue that, even under *Yogman*, they are entitled to summary judgment. Plaintiffs contend that extrinsic evidence fails to resolve the ambiguity at *Yogman* step two, and thus the Court should go to the third step, where the Court employs appropriate maxims of construction, like *contra proferentum*, to resolve any remaining ambiguity. Regardless of the path taken, Plaintiffs argue, the Court will arrive at an interpretation of "receptionist minute" that requires Ruby to measure a receptionist minute in actual time, rounded to the nearest second.[2] Ruby responds that its standard-form contract is not an adhesion contract and also that undisputed extrinsic evidence resolves any ambiguities in the meaning of "receptionist minute"

---

[1] Ruby argues that the term "receptionist minute" is silent, not ambiguous, as to whether Ruby may bill for "park-time" when calculating a receptionist minute. Park-time is the time that a Ruby receptionist places on hold a customer of a class member. The Court disagrees and continues to find the term "receptionist minute" ambiguous also on whether Ruby may include park-time in calculating a class member's receptionist minutes.

[2] In earlier filings, Plaintiffs offered a further alternative interpretation of the term "receptionist minute" under which Ruby must round up or down to the *nearest* half-minute, or 30-second increment. *See* Pls.' Reply in Supp. of their Mot. for Class Certification (ECF 120) at 27 n.12.

in its favor so that Ruby is entitled to summary judgment.[3] If the Court disagrees with that conclusion, however, Ruby proposes different maxims of construction to resolve the remaining ambiguities. Ruby contends that the maxims that it proposes show the term "receptionist minute" properly being measured by always rounding *up* to the "nearest" half-minute, or 30-second, increment.[4]

### 1.  Contracts of Adhesion

Plaintiffs first argue that the Court should construe Ruby's standard-form contract against Ruby without examining extrinsic evidence of the parties' intent because Ruby's contract is a contract of adhesion. Plaintiffs rely on *Bob's Red Mill Natural Foods, Inc. v. Excel Trade, LLC*, 2013 WL 5874574 (D. Or. Oct. 30, 2013), which acknowledged that Oregon courts have sometimes found it appropriate to disregard the *Yogman* analysis and instead construe a contract against the drafter. Those circumstances, however, are limited. Oregon courts have only dispatched with the *Yogman* framework in favor of applying the maxim of *contra proferentum* in insurance contracts—inapplicable here—and contracts of adhesion. *See Bob's Red Mill*, 2013 WL 5874574 at *9. Indeed, "[n]o Oregon court has ever applied any such rule in connection with a contract negotiated at arm's length between parties of roughly equal bargaining power." *Id.*

---

[3] Plaintiffs also assert quasi-contract theories—unjust enrichment and money had and received—in the alternative to their breach of contract claim. Ruby argues that Plaintiffs may not proceed under both contract and quasi-contract theories. Ruby is correct to the extent that Plaintiffs are not entitled to recover under both contract and quasi-contract theories. Under Oregon law, however, Plaintiffs may present both theories in the alternative at trial. *See Kashmir Corp. v. Patterson*, 289 Or. 589, 592 (1980).

[4] The Court notes that Ruby's use of the word "nearest" in describing how it always "rounds up" may be confusing to a reasonable person, even if that word does not create a legal ambiguity in the context in which Ruby uses it. A less confusing word would be "next," as in "rounded up to the next half-minute increment." The Court anticipates considering the evidence presented at trial that may explain why Ruby selected the word "nearest," rather than the word "next," to modify "half-minute increment."

Commentators offer different definitions of the phrase "contract of adhesion," and they diverge particularly over whether unequal bargaining power is the mark of an adhesion contract. Some commentators consider the presence of unequal bargaining power to be the key feature that distinguishes a contract of adhesion from merely a standard-form contract. *See* Friedrich Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract*, 43 Colum. L. Rev. 629, 632 (1943) (noting that standardized contracts are often contracts of adhesion because the party with stronger bargaining power presents the standardized contract to a party with weaker bargaining power). Similarly, *Williston on Contracts* favorably cites several decisions defining a contract of adhesion as a standard-form contract offered by a party of superior bargaining power to a party of weaker bargaining power. *See, e.g.*, 1 Williston on Contracts § 1:21 (4th ed. 1990) ("'Contracts of adhesion' arise when a party possessing superior bargaining power presents a standardized form of agreement to a party whose choice remains either to accept or reject the contract without the opportunity to negotiate its terms.") (citing *Tedesco v. Home Savings Bancorp, Inc.*, 389 Mont. 468 (2017)); 8 Williston on Contracts § 18:9 (4th ed. 1990) ("A 'contract of adhesion' is one drafted and *imposed by a party of superior strength* that leaves the subscribing party little or no opportunity to alter the substantive terms, and only the opportunity to adhere to the contract or reject it.") (citing *Grayiel v. Appalachian Energy Partners 2001-D, LLP*, 736 S.E.2d 91 (W. Va. 2012)) (emphasis added).[5]

---

[5] The Court recognizes that Ruby customers have no power or ability to bargain over the terms of Ruby's standard-form contract. As discussed below, however, a class member's lack of ability to negotiate with Ruby shows only that Ruby's contract was a standard-form contract. To be a contract of adhesion, Ruby must not only offer a standard-form contract, it also must possess superior bargaining power over its customers. Because Ruby customers have substantial market alternatives to Ruby's services, Ruby's contract with its customers is not a contract of adhesion.

Not everyone agrees, however. *Corbin on Contracts* explains that "[a] contract which is a mass standardized form is always a contract of adhesion, because it cannot be negotiated about." 5 Corbin on Contracts § 24.27C (1993). *Corbin* rejects definitions that require the presence of unequal bargaining power, concluding that "all the bargaining power in the world is useless if there is no real, genuine opportunity to use that power." *Id.*

Oregon law, which the parties agree applies here, follows Kessler's and Williston's approach. Oregon courts define a contract of adhesion as "a 'take-it-or-leave-it contract' that is the product of unequal bargaining power between the parties." *Motsinger v. Lithia Roes-FT, Inc.*, 211 Or. App. 610, 615 (2007) (quoting *Reeves v. Chem Indus. Co.*, 262 Or. 95, 101 (1972)); *see also Sprague v. Quality Rests. N.W., Inc.*, 213 Or. App. 521, 526 (2007) (defining a contract of adhesion as "an agreement between parties of unequal bargaining power, offered to the weaker party on a 'take-it-or-leave-it' basis") (quoting *Reeves*, 262 Or. at 101).

When determining whether unequal bargaining power exists between parties, Oregon law looks to whether practical alternatives to the drafting party's goods or services were available to the non-drafting party. *See Mann v. Wetter*, 100 Or. App. 184, 187-88 (1990). In *Mann*, the Oregon Court of Appeals concluded that a scuba-diving school did not have superior bargaining power to a customer both because scuba-diving lessons are "non-essential" and because the customer "ha[d] a multitude of alternatives" to the school's services. *Id.* at 188. Similarly, federal courts applying Oregon law have expressed skepticism that a standard-form contract is a contract of adhesion when market alternatives were available to the non-drafting party. *See, e.g.*, *Willis v. Nationwide Debt Settlement Grp.*, 878 F. Supp. 2d 1208, 1216 (D. Or. 2012) ("[I]t is difficult for the Court to conclude that Plaintiffs did not have any bargaining power in this transaction because, as noted, there were other providers of the debt-consolidation services with whom

Plaintiffs could have chosen to contract."). Freedom to discontinue use of the drafting party's services is also relevant to this market-power approach to identifying unequal bargaining power. For example, in *Mann*, the Oregon Court of Appeals doubted the existence of unequal bargaining power because the non-drafting party "remained free not to continue the diving program," even after he began and paid for the lessons. *Mann*, 100 Or. App. at 188.

Ruby's contract is a standard-form contract, but, because it is not the product of unequal bargaining power, it is not a contract of adhesion. Also, Ruby's market power is limited. First, Ruby provides a non-essential service. *See id*. Plaintiffs could choose not to use a receptionist service and instead hire a receptionist. Alternatively, Plaintiffs could answer their own telephone calls or use an automated or mechanical answering machine to answer or direct calls and take messages. Second, the services of several competitors to Ruby are available to Plaintiffs. *See id.*; *Willis*, 878 F. Supp. 2d at 1216. Finally, even after contracting with Ruby, Plaintiffs could discontinue their relationship with Ruby with ease. *See Mann*, 100 Or. App. at 188. Ruby's contract operates month-to-month, and in many cases Ruby customers who cancelled within the first three weeks of their contract received a full refund. Stepleton Decl., Ex. 10 (ECF 166-10) at 5-6. Because Ruby provides a non-essential service, competes with other providers of similar services, and gives customers ample freedom to discontinue its services, Ruby does not possess unequal bargaining power over Plaintiffs. As a result, Ruby's contract is not a contract of adhesion and the Court should interpret Ruby's standard-form contract with Plaintiffs using the *Yogman* framework, including looking to any admissible extrinsic evidence and, if needed, using maxims of construction to resolve any remaining ambiguous terms.

This approach follows the approach that other federal courts have taken in class action breach of contract cases involving ambiguous terms in standard-form contract. In *Gillis v.*

*Respond Power, LLC*, 677 F. App'x 752 (3d Cir. 2017), the Third Circuit, in an unpublished

decision, declined to consider extrinsic evidence of individual class members' understanding of a

term in a standard-form contract with a public utility. *Gillis*, 677 F. App'x at 756. Ignoring

extrinsic evidence of the parties' intent is reasonable in the context of a public utility contract. As

the Third Circuit explained, public utility contracts are like contracts of adhesion in that a public

utility customer must enter into a standard-form contract to receive an essential service for which

there is little-to-no competition. *See id.* Extrinsic evidence of the parties' intent remains relevant,

however, even in a case involving a standard-form contract, when the drafting party possesses no

superiority of bargaining power over the non-drafting party. *See Bob's Red Mill Natural Foods,*

*Inc.*, 2013 WL 5874574, at *9.

Relying on *Derenco, Inc. v. Benjamin Franklin Federal Savings and Loan Association*,

281 Or. 533 (1978), Plaintiffs argue that Oregon courts have applied *contra proferentum* instead

of *Yogman* even when a party to a standard-form contract had market alternatives. *Derenco*,

however, is not on point. The Oregon Supreme Court in *Derenco* noted that there was "no

contract, actual or implied" between the parties. 281 Or. at 559. It is unsurprising, therefore, that

an Oregon court did not employ *Yogman*'s contract-interpretation analysis in a case where no

contract existed. Because Ruby's contract is not a contract of adhesion, the *Yogman* analysis

governs interpretation of Ruby's standard-form contract.

### 2.  Extrinsic Evidence

Because the Court has concluded that the term "receptionist minute" is ambiguous, the

*Yogman* analysis continues to step two, where the trier of fact examines any admissible extrinsic

evidence to resolve ambiguous terms. *See Apeldyn Corp. v. Eidos, LLC*, 943 F. Supp.

2d 1145, 1149 (D. Or. 2013). Generally, summary judgment is inappropriate at *Yogman* step-

two. *Dial Temp. Help Serv.*, 255 Or. App. at 611. When undisputed extrinsic evidence resolves

an ambiguity in a party's favor, however, the Court may grant summary judgment. *Id.* at 612.

Ruby argues that extrinsic evidence of the parties' intent shows that a critical mass of the

class members understood the term "receptionist minute" to involve always rounding up to the

next, or nearest, half-minute increment. Ruby identifies three sources of evidence to support this

part of its motion for summary judgment. First, Ruby points to a paragraph in a declaration from

its Vice President for Legal Affairs stating, "Ruby has used the term 'receptionist minute,' and

has computed time in rounded-up half-minute units, for many years, including before the class

period," as evidence that Ruby has used a consistent interpretation of the term "receptionist

minute." Stepleton Decl. (ECF 166) at 9.

Second, Ruby points to evidence that it described its billing practices to customers. This

evidence includes two documents, known as "Ruby 101" and "Ruby FAQ," that Ruby

distributed to new customers beginning in November 2016. Both Ruby 101 and Ruby FAQ

explain that

> receptionist minutes are calculated by counting only the time a
> receptionist is active on your calls. Once the call is connected to
> someone in your office (or to voicemail), your receptionist minutes
> no longer accumulate on that particular call. . . .
>
> Receptionist minutes are billed in 30-second increments, and calls
> are rounded up to the *nearest* 30-second mark. If a call is ten
> seconds long, it will be billed as 30 seconds (or half of a
> receptionist minute).

Ruby FAQ (ECF 166-3) at 2 (emphasis added).[6] Ruby also highlights testimony from Ruby

employees, including former sales manager Ashley Fisher-Nelson, who testified that she

"encourage[d] employees to follow a script which would outline, for example, that '[Ruby]

---

[6] *See* n.4, *supra*.

bill[s] in 30-second increments so, 1 second to 30 seconds is half a minute, and 31 seconds to 60 seconds is billed as a full minute." Fisher-Nelson Decl. (ECF 167-7) at 2.

Finally, Ruby argues that its course of performance with class members supports its interpretation of "receptionist minute." Ruby identifies invoices that it sent to customers and customer call records on Ruby's mobile application. Both the invoices and the call records show receptionist minutes for each call that are always billed (or measured) in half-minute increments. *See* Isaak Decl., Ex. 15 (ECF 166-15) at 1-4; Def.'s Mot. for Summary J. (ECF 163) at 9 (screenshot of Ruby mobile application). These invoices and call records, Ruby contends, show a uniform course of performance of billing in half-minute increments.

Plaintiffs respond that Ruby's extrinsic evidence does not resolve the ambiguities in the term "receptionist minute," and Plaintiffs point to communications between Ruby and class members where Ruby failed accurately to describe its billing practices. First, Plaintiffs highlight evidence showing that Ruby tried to hide its billing practices from customers. For example, Justin Enger, a Ruby sales representative, testified that a Ruby supervisor instructed him *not* to explain Ruby's practice of always rounding up unless a customer specifically asked about that practice. Enger Decl. (ECF 108-19) at 56-57. Similarly, email templates used by Ruby's sales representatives communicating with prospective customers explain that "'[r]eceptionist minutes' are the time a Ruby Receptionist is actually involved in your calls; take as long as you like after a call is transferred at no cost" or, similarly, "[Ruby] only charge[s] for the time our receptionists spend handling your calls live. That's it. No hidden fees! Once a call is connected to you or transferred to your voicemail, we stop billing." Berne Decl., Ex. 1 (ECF 121-1) at 3-4. Plaintiffs also emphasize information about Ruby's billing practices available on the Ruby website. Two versions of the "Pricing" page of Ruby's website, one from June 2019 and another from

February 2015, both fail to explain that Ruby always rounds up to the next highest half-minute increment when calculating a receptionist minute. *See* Berne Decl., Ex. 7 (ECF 196-2) at 1-4, Berne Decl., Ex. 8 (ECF 196-3) at 1-2.

Second, Plaintiffs highlight evidence that Ruby did not accurately describe its billing practices to prospective customers who expressly asked about how Ruby measures a receptionist minute. For example, when customer Kelli Victorian asked, "do you count to the exact second for the calls or is anything over 1 second automatically count[ed] as the next minute?" Ruby sales representative Lauren Bell replied, "[w]e bill based on 30-second increments – so each call is rounded to the *nearest* 30 seconds." Berne Decl. Summary J., Ex. 10 (ECF 196-4) at 2 (emphasis added). Bell's email does not disclose that Ruby always rounds *up* the time for each call to the next half-minute increment. Indeed, Bell's email provided false and factually incorrect information. Similarly, customer Rick Davis signed a declaration stating that, because Ruby represented that he "would only be billed for 'the time that the receptionist was involved in the call,'" he did not know until after contracting that Ruby charged for hold time (or "park-time"). Berne Decl., Ex. 13 (ECF 196-7) at 2.

The Court finds that Plaintiffs' extrinsic evidence creates a genuine dispute of material fact as to whether Ruby falsely or misleadingly described its billing practices to prospective customers. Ruby's remaining undisputed evidence is Stepleton's declaration that Ruby's employees understood "receptionist minute" to include always rounding up to the next half-minute increment, accurate descriptions of Ruby's billing practices in Ruby FAQ and Ruby 101 disclosures, and Ruby's course of performance evidence. This evidence, however, does not entitle Ruby to summary judgment.

Stepleton's declaration does not support summary judgment because "[s]tatements of a party's subjective intent that were not expressed or communicated at the time the contract was formed are not permissible evidence of intent." *Apeldyn Corp.*, 943 F. Supp. 2d at 1149. Ruby's course of performance evidence is similarly unhelpful. Ruby's invoices and mobile application call records establish that Ruby had a longstanding practice of measuring a receptionist minute in half-minute, or 30-second, increments. Because, however, Ruby measures both a "call minute" and a "receptionist minute" in half-minute increments on invoices and call logs, neither would have revealed to a customer that Ruby always *rounded up* to next half-minute increment. Finally, the Ruby FAQ and Ruby 101 disclosures do not entitle Ruby to summary judgment because, although they accurately describe Ruby's rounding practices, Ruby only distributed these documents to new customers after November 2016, four years after the beginning of the class period and therefore do not resolve the ambiguities for many class members.

That a genuine dispute of material fact exists as to whether extrinsic evidence resolves the ambiguities in the term "receptionist minute" in Ruby's favor does mean that the Court agrees with Plaintiffs that extrinsic evidence cannot resolve the ambiguities in that term. Indeed, Ruby proffered extrinsic evidence that creates a genuine issue of material fact as to the viability Plaintiffs' preferred interpretation of "receptionist minute"—that Ruby measures a receptionist minute in actual time, rounded to the *nearest* second. The invoices and mobile application call records that Ruby produced as part of its course of performance evidence represent significant evidence that class members understood that Ruby always billed in half-minute (or 30-second) increments, even if class members did not know that Ruby always rounded up to the next half-minute increment. At trial, the Court will evaluate all admissible evidence and make findings under the applicable preponderance standard.

Plaintiffs also argue that a court may consider course of performance evidence only when direct evidence of a party's intent is lacking. Plaintiffs themselves, however, provide the Court with direct extrinsic evidence that creates a genuine issue of material fact as to the viability of Plaintiffs' preferred interpretation. *See* Berne Decl., Ex. 4 (ECF 196-4) at 2 (Ruby email explaining to a customer that Ruby "bill[s] based on 30-second increments"). Additionally, Jami Oliver, an officer of class representative Oliver Law Offices, Inc., testified that she "knew that they [Ruby] were billing in 30-second increments," even if she did not know that "they were rounding up to next 30 seconds for every call." Isaak Decl., Ex. 1 (ECF 167-1) at 2.

Although the extrinsic evidence before the Court at this stage does not entitle either party to summary judgment, extrinsic evidence at trial may yet resolve the ambiguities (or at least some of them) in the term "receptionist minute." The Court invites the parties to present at trial extrinsic evidence of the parties' expressed understanding of the term "receptionist minute." The Court also requests that the parties be prepared to advise the Court on which party bears the burden of proving that extrinsic evidence does or does not resolve ambiguous terms in a contract.

### 3. Maxims of Construction

At step-three of *Yogman*, the trier of fact selects maxims of construction to resolve any remaining ambiguities in a contract. 325 Or. at 364. Summary judgment is generally inappropriate at step-three. *PGF Care Ctr., Inc*, 208 Or. App. at 151. Plaintiffs argue that the Court should employ the maxim of *contra proferentum*. Ruby argues that *contra proferentum* is the last maxim that the Court should employ, and the Court should first employ these maxims:

> 1.    "When the terms of an agreement have been intended in a different sense by the parties, that sense is to prevail, against either

party, in which the party supposed the other understood it."
ORS 42.260.[7]

2.      "When different constructions of a provision are otherwise
equally proper, that construction is to be taken which is most
favorable to the party in whose favor the provision was made."
ORS 42.260.

3.      "In the absence of contrary indication, it is assumed that
each term of an agreement has a reasonable rather than an
unreasonable meaning[.]" Restatement (Second) of Contracts
§ 203 cmt. c (Am. L. Inst. 1981); *see also Osborn v. Boeing
Airplane Co.*, 309 F.2d 99, 103, n.8 (9th Cir. 1962) ("Where the
choice is open, language relating to the terms of a contract will
be so interpreted that the contract will be fair and reasonable rather
than unfair and unreasonable.").

Def.'s Mem. in Opposition to Pls.' Mot. for Summary J., ECF 227 at 18.

Because a genuine issue of material fact exists as to whether extrinsic evidence can

resolve ambiguity in the meaning of "receptionist minute" at *Yogman* step two, the Court cannot

---

[7] *See also* Restatement (Second) of Contracts § 201 (Am. L. Inst. 1981), which provides:

(1)      Where the parties have attached the same meaning
to a promise or agreement or a term thereof, it is interpreted in
accordance with that meaning.

(2)      Where the parties have attached different meanings
to a promise or agreement or a term thereof, it is interpreted in
accordance with the meaning attached by one of them if at the time
the agreement was made

(a)      that party did not know of any different
meaning attached by the other, and the other knew the meaning
attached by the first party; or

(b)      that party had no reason to know of any
different meaning attached by the other, and the other had reason
to know the meaning attached by the first party.

(3)      Except as stated in this Section, neither party is
bound by the meaning attached by the other, even though the result
may be a failure of mutual assent.

proceed to *Yogman* step three at this stage of the litigation. Instead, that must await trial. Even were it appropriate for the Court to proceed to *Yogman* step three at summary judgment, the trier of fact would need to resolve genuine disputes of material fact before selecting the appropriate maxim or maxims of construction.

For example, one of Ruby's proposed maxims counsels that "[w]hen the terms of an agreement have been intended in a different sense by the parties, that sense is to prevail, against either party, in which the party supposed the other understood it." ORS § 42.260.[8] Thus, if Ruby knew (or had reason to know) that its customers did not understand that Ruby always rounded up to the next half-minute increment even if the customer understood that Ruby billed in 30-second increments, Ruby's own proposed maxim might require the Court to interpret "receptionist minute" as the time that a receptionist spends on a call, rounded up or down to the *nearest* half-minute increment.

Plaintiffs have proffered evidence that Ruby was not only aware that its customers did not understand that Ruby always rounded up when calculating a receptionist minute, but also affirmatively sought to allow customers to maintain a misimpression. As discussed above, Justin Enger testified that Ruby instructed him not to mention, let alone correctly explain, Ruby's rounding up practices unless a customer specifically asked the right question. Enger Decl. (ECF 108-19) at 56-57. Additionally, Ruby's sales representatives used email templates that did not mention Ruby's rounding practices when communicating with customers. Berne Decl., Ex. 1 (ECF 121-1) at 3-4; *see also* Berne Decl., Ex. 10 (ECF 196-4) at 2 (showing Ruby sales representative Lauren Bell explaining to a customer that Ruby "bill[s] based on 30-second

---

[8] This direction is similar to the principles explained in Restatement (Second) of Contracts § 201. *See* n.7, *supra*.

increments – so each call is rounded to the *nearest* 30 seconds") (emphasis added). At trial, the Court will listen for evidence explaining the history and reasons for these practices.

Ruby, however, offers evidence disputing Plaintiffs' contention, including a declaration from former sales manager Ashley Fisher-Nelson, who testified that she "encourage[d] employees to follow a script which would outline, for example, that '[Ruby] bill[s] in 30-second increment so, 1 second to 30 seconds is half a minute, and 31 seconds to 60 seconds is billed as a full minute." Fisher-Nelson Decl. (ECF 167-7) at 2. If the Court reaches step three of *Yogman*, the Court might need to resolve these factual issues and perhaps others before selecting an appropriate maxim of construction. For these reasons as well, summary judgment for either party on principles of contract interpretation is inappropriate.

## B.  Decertification, Affirmative Defenses, and Arbitration

Ruby also asks the Court to decertify the class. Ruby argues decertification is necessary for two reasons. First, Ruby contends that extrinsic evidence reveals that a "critical mass" of its customers shared Ruby's understanding of the term "receptionist minute" and the need to consider extrinsic evidence unique to each class member deprives the class of common questions of law or fact. According to Ruby, this also destroys the predominance of common issues over issues unique to individual class members. Second, Ruby argues that class certification hampers its ability to press the affirmative defenses it asserts entitle it to partial summary judgment against some class members on breach of contract and some measures of damage. Along with affirmative defenses like account stated, modification, and waiver, Ruby contends changes in its updated Terms and Conditions in 2018 and 2019 limits the amount of damages available to class members. Additionally, among the clauses that Ruby added to its Terms and Conditions in 2019 was a mandatory arbitration clause. Ruby now asks the Court to enforce that arbitration clause, at least against certain class members.

In its Order Granting Class Certification (ECF 128), the Court explained why class certification was warranted. *See McKenzie Law Firm PA. v. Ruby Receptionist, Inc.*, 2020 WL 1970812, at *4-11 (D. Or. April 24, 2020). In that Order, the Court found that Plaintiffs had satisfied, among things, the requirement under Rule 23(a)(2) that "there are questions of law or fact common to the class" because Plaintiffs' breach of contract claim turned on common questions like "whether Ruby's call time calculation method breached its contracts" and "whether these breaches caused damages to class members." *Id.* at *5. Similarly, the Court found that Plaintiffs met the requirement in Rule 23(b)(3) that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Id.* at *8-9.

To satisfy the commonality requirement, Plaintiffs must show that class members suffered the "same injury"—that their claims depend on a "common contention." *Wal-Mart*, 564 U.S. at 350 (quotation marks omitted). "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "[T]here is substantial overlap between" the test for commonality under Rule 23(a)(2) and the predominance test under 23(b)(3). *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010). The predominance test, however, "is 'far more demanding' and asks 'whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Id.* (citation omitted) (quoting *Amchem*, 521 U.S. at 623-24). As explained in the Court's Certification Order, predominance may be missing in a class that "include[s] a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct." *McKenzie Law Firm P.A..*, 2020 WL 1970812 at *4-11 (quoting *In re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 310 (N.D. Cal. 2018)). In class litigation involving a

putative class of comparable size (16,000 members), a District of Columbia District Court found

that class certification was inappropriate when 2,000 members suffered no injury. *In re Rail*

*Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 137-38 (D.D.C. 2017).

At the same time, "decertification is a 'drastic step,' not to be taken lightly." 3 *Newberg*

*on Class Actions* § 7:37 (5th ed. 2019). Instead, a court should favor altering the class definition

either by amendment or by creating subclasses over decertification. *Id.* Indeed, the Federal Rules

of Civil Procedure permit a court to alter or amend its class certification order at any time before

final judgment. *See* Fed. R. Civ. P. 23(c)(1)(C). District courts are "well situated to winnow

out . . . non-injured members at the damages phase of the litigation, or to refine the class

definition." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136 (9th Cir. 2016). Moreover, a

court sitting as the trier of fact has greater leeway to structure class action litigation. *See Sibley v.*

*Sprint Nextel Corp.*, 315 F.R.D. 642, 665-66 (D. Kan. 2016) (denying motion to decertify and

noting that a bench trial would mitigate concerns about complexity of evidence).

## 1. Decertification Based on Extrinsic Evidence

Ruby argues that individualized extrinsic evidence of class members' intent makes

classwide resolution of Plaintiffs' breach of contract claim impossible. Plaintiffs allege that Ruby

breached its standard-form contract by miscalculating class members' receptionist minutes.

Standard-form contracts should be "interpreted wherever reasonable as treating alike all those

similarly situated." Restatement (Second) Contracts § 211(2) (1981); *see also Gillis*, 677 F.

App'x at 756 ("Logically, then, standard-form contracts should be interpreted uniformly as to all

similarly situated signatories whenever it is reasonable to do so . . . ."). Here, class members for

whom there is no extrinsic evidence of objective manifestations of intent would be similarly

situated. Thus, for any class member for whom extrinsic evidence is lacking, the Court should

interpret "receptionist minute" uniformly.

The question, then, is whether Ruby has extrinsic evidence of objective manifestations of the parties' intent for a sufficiently large number of class members that the common breach of contract question is not susceptible to classwide resolution. At this stage, the answer remains no, although some of Ruby's evidence portends the possibility that evidence presented at trial may cause the Court to consider amending the class definition or create subclasses before final judgment. The most significant evidence Ruby offers in support of its motion to decertify the class is a declaration from Diana Stepleton, Ruby's Vice President for Legal Affairs. Stepleton's declaration came with a table documenting email and telephone discussions that Ruby's sales representatives had with customers about Ruby's billing practices.[9]

Some of the table's evidence simply does not warrant decertification. For example, Ruby points to 478 "Phone Conversations Where Ruby Told Customers About Billing in 30-Second Increments" and, similarly, 290 emails to customers "Featuring 30-Second Increments." Suppl. Stepleton Decl. (ECF 191) at 4. As explained, telling customers that Ruby bills in half-minute increments is different from telling customers that Ruby always rounds up to the next highest half-minute increment. Similarly, the table reveals that Ruby's sales representatives had 151 email conversations—either at the time of contracting, during the free trial period, or after contracting—with customers in which Ruby explained that "Ruby Rounds up to the *Nearest* 30-Second increment" or showed "Specific Example of How Rounding Works." Suppl. Stepleton

---

[9] Stepleton at first filed an inaccurate version of this table. Stepleton discovered her error during her August 3, 2020 deposition and filed a corrected declaration on August 15. *See* Suppl. Stepleton Decl. (ECF 191) at 2-3. For purposes of this Opinion, the Court relies only on the corrected table. Plaintiffs have asked the Court to strike this table and other portions of Stepleton's initial and supplemental declarations. ECF 208. For reasons discussed later in this Opinion, the Court denies that motion.

Decl. (ECF 191) at 4 (emphasis added).[10] Although these emails appear to have informed these recipients that Ruby always rounded up to the next half-minute increment when calculating a receptionist minute, in a class containing 18,000 members, 151 recipients is not enough to defeat commonality or predominance. *See McKenzie Law Firm PA.*, 2020 WL 1970812, at *9.[11]

One item of information in the table, however, suggests that evidence at trial might require the Court to amend the class definition or create subclasses. Stepleton's table provides that about 5,000 Ruby customers received Ruby FAQ or Ruby 101 before, at, or shortly after contracting. As explained earlier, Ruby 101 and Ruby FAQ appears to have accurately explained that Ruby always rounded up to the next highest half-minute increment when calculating a receptionist minute. *See, e.g.*, Ruby FAQ (ECF 166-3) at 2. Thus, Ruby FAQ and Ruby 101 might constitute objective evidence of the parties' intent relevant to the *Yogman* step-two analysis. The number of class members who received at least one of these documents, moreover, appears to be large enough to warrant amending the class. At the same time, Plaintiffs contest the relevance of the Ruby FAQ and Ruby 101 disclosures, arguing many class members likely never read those documents, which Ruby provided only by hyperlink in an email to class members who contracted with Ruby after November 2016. The Court will be better able to determine whether

---

[10] *See* n.4, *supra.*

[11] Ruby also proffers a handful emails where it told customers about its billing practices. *See, e.g.*, Suppl. Stepleton Decl., Ex. 2 (ECF 222-2) at 2; Suppl. Stepleton Decl., Ex. 3 (ECF 222-3) at 1. These specific emails do not change the Court's analysis. First, presumably those emails are among the 151 emails documented in Stepleton's table. Second, even if those emails supplement the emails documented in Stepleton's table, there are not enough emails to warrant decertification.

changes to the class definition are necessary for class members who received the Ruby FAQ or Ruby 101 disclosures after the Court considers the parties' evidence at trial.[12]

Similarly, the parties' evidence at trial about how frequently, thoroughly, or accurately Ruby's sales representatives described Ruby's billing practices to customers over the telephone may aid the Court in determining whether so many class members were aware of Ruby's billing practices at the time of contracting that decertification or amendment of the class definition is necessary. In its motion to decertify the class, Ruby cites declarations from former Ruby employees Ashley Fisher-Nelson and Rachel Conrad Wyss. Fisher-Nelson explained that she trained employees to explain Ruby's billing practices, including offering examples of how Ruby always rounded up. Similarly, Wyss stated that she routinely explained the concept of a receptionist minute to new customers over the telephone. If Ruby had a business routine of explaining its billing practices with customers over the telephone, Ruby argues, many class members would likely have understood Ruby's billing practices. *See* Fed. R. Evid. 406. Thus, these declarations may show a common understanding communicated by the parties that the Court should consider at *Yogman* step two. Evidence of whether Ruby had a business routine of providing this information to potential customers, thus, may be relevant to the question of whether individual issues predominate over questions common to all class members.

---

[12] Just as treating similarly situated parties similarly when interpreting a standard-form contract requires interpreting "receptionist minute" to mean the same thing for any class member for whom there is no extrinsic evidence, the Court likely must interpret "receptionist minute" to mean the same thing for any class member whose only extrinsic evidence is having received the Ruby FAQ or Ruby 101 disclosures. The Court notes that subclasses may be necessary for class members who received Ruby FAQ or Ruby 101, depending on when (i.e., at the time of contracting, during the free trial period, or after contracting) the class member received Ruby FAQ or Ruby 101.

It is neither necessary nor appropriate for the Court to make this decision now, however, because Plaintiffs have proffered evidence that at least might conflict with Fisher-Nelson's and Wyss's declarations. Another Ruby employee, Justin Enger, testified that Ruby instructed him to *avoid* telling Ruby customers that Ruby always rounded up to the next highest thirty-second increment when calculating a receptionist minute. *See* Enger Decl. (ECF 108-19) at 56-57; *see also* Berne Decl., Ex. 10 (ECF 196-4) at 2 (showing Ruby sales representative Lauren Bell explaining to a customer that Ruby "bill[s] based on 30-second increments – so each call is rounded to the *nearest* 30 seconds") (emphasis added). The parties' evidence at trial may clarify these questions.

### 2. Decertification and Summary Judgment Based on Affirmative Defenses

Ruby's affirmative defenses also do not warrant decertification or entitle Ruby to partial summary judgment. Ruby contends that, because its invoices always show receptionist minutes measured in half-minute, or 30-second, increments, customers must have correctly understood Ruby's billing practices after receiving their first invoice. Ruby argues that this supports several affirmative defenses premised on the notion that class members' actions after receiving their first invoice constitute assent to Ruby's billing practices: (1) the affirmative defense of account stated against any class member who paid their invoice without objection; (2) the affirmative defense of waiver against any class member who continued to use Ruby's services after receiving a bill; and (3) the affirmative defense of modification against any class member who continued to use Ruby's services after Ruby modified the contract by increasing prices. As explained earlier, however, Ruby's invoices only show that Ruby measured a receptionist minute in half-minute increments; the invoices would not have disclosed to customers that Ruby always *rounded up* to next half-minute increment when calculating a receptionist minute. Thus, Ruby is not entitled to summary judgment on these defenses. Further, individualized evidence of the actions that class

members took in response to receiving invoices does not appear to be irrelevant, and individual issues would not then predominate over questions common to the class.

### 3.  Decertification and Summary Judgment based on Damages or Updated Terms and Conditions

Finally, Ruby argues that it is entitled to summary judgment on some aspects of Plaintiffs' damage claims and the unavailability of damages for some class members warrants decertification. As for decertification, courts often certify classes involving class members who share common questions on liability but whose damage award will depend on individualized proof. *See Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 593-94 (S.D.N.Y 2013). Thus, Ruby's damages-related arguments do not warrant decertification.

Further, some of Ruby's arguments for summary judgment on damages rely on arguments that the Court has already rejected in this Opinion. This includes Ruby's argument that class members are not entitled to damages after the first three months of using Ruby's services because Ruby's invoices gave class members notice of Ruby's practice of billing in 30-second increments. It also includes Ruby's argument that class members who received Ruby FAQ or Ruby 101 disclosures are not entitled to any damages. The Court has already addressed these arguments.

Ruby also argues that, because customers bought an agreed-upon allotment of receptionist minutes, damages can only be awarded to customers who paid "overage minutes."[13] Ruby contends that contract damages must "put the person in the position he would have been in

---

[13] "Overage minutes" are additional receptionist minutes that a Ruby customer uses beyond the customer's monthly agreed-upon allotment of receptionist minutes. The price per overage minute depends on how many monthly receptionist minutes are bought by a customer. For example, if a customer buys 100 receptionist minutes for $229.00 per month, the customer would be charged $2.29 for each additional receptionist minute beyond the initial 100 receptionist minutes. *See* Stepleton Decl., Ex. 10 (ECF 166-10) at 5.

had the contract not been breached." *Siler v. Turnbull*, 71 Or. App. 787, 790 (1985). Because class members would have paid for the agreed-upon allotment of receptionist minutes regardless of how many receptionist minutes the class member ultimately used, Ruby argues, class members who never exceeded their monthly allotment are already in the same position that they would have been in had Ruby not allegedly breached the contract. Ruby's damages expert estimates that, if damages are only available to customers charged for overage minutes, Plaintiffs' damages would be at most $11,403,218, not including prejudgment interest. Although the Court is tentatively inclined to agree with Ruby that class members who did not pay for overage minutes are not entitled to any damages, Plaintiffs have offered a report from an expert witness purporting to have crafted a formula for fairly compensating class members for damages resulting from the lost use of receptionist minutes even when they did not pay for any overage minutes. The Court denies summary judgment and will decide after all evidence has been presented whether class members who did not pay for overage minutes are entitled to recover any damages.

Finally, Ruby argues that because it updated its Terms and Conditions in 2018 accurately to describe its billing practices and emailed all customers a hyperlink to its updated Terms and Conditions in August 2018, no class member is entitled to damages after September 2018. Ruby argues that its hyperlink to its updated Terms and Conditions is "browsewrap." *See Card v. Wells Fargo*, No. 19-1515, 2020 WL 1244859, at *6 (D. Or. Mar. 16, 2020) (contrasting browsewrap with so-called "clickwrap" agreements, which provide customers the terms on the same webpage and force the customer to scroll through the terms and click "I agree" before proceeding). The enforceability of browsewrap largely turns on whether a customer received conspicuous notice of the updated terms. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176-78 (9th Cir. 2014).

This Court previously explained that the conspicuousness of a notice, as well as other factors bearing on the enforceability of browsewrap, are fact-intensive questions not generally susceptible to resolution on summary judgment. *See Card*, 2020 WL 1244859, at *6-7. Indeed, Plaintiffs argue that the hyperlink to the updated Terms and Conditions was not conspicuous but buried in an email containing customers' invoices. Ruby customers are unlikely to have read invoice emails closely, Plaintiffs argue, because a customer generally pays a monthly invoice automatically using the customer's stored credit-card information. Thus, genuine disputes of material fact exist as to the enforceability of the updated Terms and Conditions, making summary judgment inappropriate.

### 4. Arbitration

In September 2019, ten months after Plaintiffs filed their complaint in this action, Ruby added a mandatory arbitration clause to its Terms and Conditions. Ruby now asks the Court to enforce that clause and compel arbitration. Although there is a strong federal policy favoring enforcement of arbitration agreements, a party seeking to compel arbitration waives the right to arbitrate when that party "engage[s] in conduct inconsistent with their right to arbitrate" that prejudices the opposing party. *Martin v. Yasuda*, 829 F.3d 1118, 1124-26 (9th Cir. 2016). This Court previously has found parties have waived their right to compel arbitration by "continu[ing] in a lawsuit long enough and tak[ing] advantage of the procedural benefits of civil litigation." *Munger v. Cascade Steel Rolling Mills, Inc.*, 332 F. Supp. 3d 1280, 1286 (D. Or. 2018).

By its litigation conduct here, Ruby has waived its right to compel arbitration against Plaintiffs. Ruby notified its customers of the updated Terms and Conditions that included the newly added arbitration clause on September 10, 2019, but did not move to compel arbitration until August 21, 2020, more than 11 months later. During the intervening months, Ruby attempted to benefit from being in federal court. *See Martin*, 829 F.3d at 1125. For example, on

September 17, 2019, Ruby moved to preclude class certification but did not mention its arbitration clause. ECF 66. On June 10, 2020, Ruby moved to include an opt-out form with the class notice letter but again did not mention its arbitration clause. ECF 144. On July 1, 2020, Ruby filed two motions for summary judgment and a motion to decertify the class, none of which mentioned Ruby's arbitration clause. ECF 163, 164, and 165. On July 24, 2020, Ruby objected to Plaintiffs' Plan for Class Notice and requested the opportunity to include a Reminder Notice regarding a class member's right to opt out of the class. ECF 176. The Court agreed with Ruby and allowed Ruby to send a Reminder Notice. ECF 187. Ruby also engaged in discovery throughout the past 11 months and successfully asked the Court to reopen discovery.

Ruby's litigation activities are precisely the sort of conduct that the Ninth Circuit has held conflicts with a right to arbitrate. *See Martin*, 829 F.3d at 1125-26 (collecting cases). Nor can there be any doubt that Plaintiffs, who "expended considerable time and money" on litigation in federal court and who would be "deprived of the benefits" of that litigation were the Court to compel arbitration, are prejudiced by Ruby's litigation conduct. *Id.* at 1127; *see also Kelly v. Pub. Util. Dist. No. 2*, 552 F. App'x 663, 664 (9th Cir. 2014) (holding that a plaintiff was prejudiced by a defendant's 11-month delay in moving to compel arbitration).

Ruby also argues that whether it has waived its right to compel arbitration is a question for the arbitrator. Ruby first quotes *Pierce County v. MA Mortenson Co.*, 798 F. App'x 160 (9th Cir. 2020) for the proposition that "it is for the arbitrator to decide whether [the defendant's] 'Claims' should be deemed 'waived.'" 798 F. App'x at 161. The waiver discussed in *Pierce County*, however, was not waiver by litigation conduct but waiver under the parties' agreement. *Id.* ("[I]t is for the arbitrator to decide whether [the defendant's] 'Claims' should be deemed

'waived' *for not satisfying the requirements of § 8.01(C)* [of the parties' agreement]." ) (emphasis added). *Pierce County* is not on point.

Ruby also points to *Martin*, but in *Martin* the Ninth Circuit *affirmed* a district court's finding that the defendants had waived the right to compel arbitration by their litigation conduct despite the presence of an arbitration clause delegating gateway issues of arbitrability to an arbitrator. 829 F.3d at 1128. Ruby contends that its arbitration clause is different from the arbitration clause in *Martin* because Ruby's arbitration clause contains a broader delegation provision. Ruby's arbitration clause provides that "[t]he arbitrator shall have the power to rule on . . . the arbitrability of any claim or counterclaim." Stepleton Decl., Ex. 13 (ECF 201-13) at 13. *Martin*, however, explains that courts should determine whether a party waived its right to arbitrate by litigation conduct even when the arbitration clause contains a delegation provision with "all inconclusive" language that gives an arbitrator jurisdiction over any dispute "arising out of or related to" the agreement. *Id.* at 1124 (quoting *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1117 (9th Cir. 2008)). Thus, even Ruby's broad delegation provision does not preclude the Court from considering whether Ruby has waived its right to arbitrate by its litigation conduct. Because Ruby availed itself of the benefits of federal courts and compelling arbitration would prejudice Plaintiffs, the Court finds that Ruby waived its right to arbitrate this dispute.

## C. Plaintiffs' Evidentiary Motions

Plaintiffs ask the Court to exclude certain evidence offered by Ruby in support of its second motion for summary judgment and motion to decertify the class. First, Plaintiffs ask the Court to exclude Lori Bocklund's expert testimony under Federal Rules of Evidence 402, 403, 702, and 703. Bocklund stated that Ruby's receptionists spend an average of 29 seconds on each call. Bocklund arrived at that figure by measuring the time that a receptionist spent preparing to accept a call and taking notes about a call after the end of that call. Ruby's expert witness for

damages, Arik K. Van Zandt, relied on Bocklund's testimony to conclude that many class members never suffered any damages. Ruby relies on Van Zandt's report in its second motion for summary judgment and motion to decertify the class.

The Court denies Plaintiffs' motion without prejudice. Judicial efficiency is best served by the Court conditionally admitting Ms. Bocklund's expert testimony subject to a later determination under Rule 702. The Court is denying Ruby's motions for summary judgment and to decertify the class, so Plaintiffs are not harmed by Ms. Bocklund's testimony now. If Ruby relies on Ms. Bocklund's testimony at trial, the Court, acting as trier of fact, will benefit from hearing Ms. Bocklund's direct and cross-examination testimony before ruling on questions of admissibility and weight.

Plaintiffs also argue that the Court should exclude three paragraphs from Diana Stepleton's declaration as well as an exhibit submitted with her original declaration, her entire supplemental declaration, and a corrected version of the exhibit, all of which Ruby offered in support of its motion to decertify the class. The exhibit was a table that summarized the number of customers with whom Ruby discussed its billing practices by email or telephone. As Stepleton later admitted in deposition, the initial declaration and summary table were inaccurate because Stepleton counted some customers more than once. Stepleton filed a supplemental declaration admitting her mistake and a corrected summary table. Suppl. Stepleton Decl. (ECF 222) at 2-4.

Plaintiffs argue that Stepleton's summary evidence does not follow Federal Rule of Evidence 1006 because Ruby has not, as the rule requires, made "the originals or duplicates available for examination or copying, or both, . . . at a reasonable time and place." Fed. R. Evid. 1006. "[A] district court," however, "is not limited to considering only admissible evidence in evaluating whether Rule 23's requirements are met." *Sali v. Corona Reg'l Med. Ctr.*, 909

F.3d 996, 1005 (9th Cir. 2018). Similarly, when a district court considers a motion to decertify the class, the court is not limited to admissible evidence. *See Racies v. Quincy Bioscience, LLC*, 2020 WL 2113852, at \*2 (C.D. Cal. May 4, 2020). Because Ruby only relies on Stepleton's declaration and summary table to support its motion to decertify the class, admissibility is irrelevant. Moreover, as explained earlier, the Court at this time denies Ruby's motion to decertify the class. The Court may revisit its class definition after trial, but Ruby states that it will use the evidence underlying Stepleton's summary table, not the table itself, to support its arguments at trial. For these reasons, the Court denies Plaintiffs' motion to exclude certain evidence from the declarations of Diana Stepleton.

## CONCLUSION

The Court DENIES Ruby's Motion to Decertify the Class (ECF 165), First Motion for Summary Judgment (ECF 163), Second Motion for Summary Judgment (ECF 164), and Third Motion for Summary Judgment (ECF 199). The Court also DENIES Plaintiffs' Motion for Summary Judgment (ECF 198), Motion to Exclude the Testimony of Lori Bocklund (ECF 203), and Motion to Exclude Certain Evidence from the Declarations of Diana Stepleton (ECF 208).

**IT IS SO ORDERED**.

DATED this 18th day of November, 2020.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge
